**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 25, 2012

No. 11-60057

Lyle W. Cayce
Clerk

NEW ORLEANS DEPOT SERVICES, INCORPORATED,

Petitioner

v.

DIRECTOR, OFFICE OF WORKER'S COMPENSATION PROGRAMS, U.S.
DEPARTMENT OF LABOR; NEW ORLEANS MARINE CONTRACTORS;
SIGNAL MUTUAL INDEMNITY ASSOCIATION LIMITED,

Respondents

Petition for Review of an Order of the
Benefits Review Board

Before STEWART, CLEMENT, and GRAVES, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Before the court is a petition for review from a decision of the Benefits Review Board ("BRB") affirming an award of workers' compensation benefits for which Petitioner New Orleans Depot Services, Incorporated ("NODSI") was found liable. As there is substantial evidence to support the factual findings of the Administrative Law Judge ("ALJ"), we deny the petition for review.

**I.**

Claimant Juan Zepeda was employed by NODSI as a container repair mechanic from 1996 until 2002, when he quit because of a bone spur injury.

No. 11-60057

Prior to his employment with NODSI, Zepeda performed container and chassis[1] maintenance for Respondent New Orleans Marine Contractors ("NOMC") for approximately five months. During his employment with both NODSI and NOMC, Zepeda was exposed to loud noises on a continuous basis and did not use hearing protection. Zepeda now suffers from an 11.3 percent binaural hearing impairment, for which he sought permanent partial disability benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA" or "the Act").[2]

At his formal hearing before the ALJ, Zepeda testified that he performed work for NODSI at two separate yards: the Chef Yard, which is approximately 300 yards from the Industrial Canal, and the Terminal Yard, which is approximately 100 yards from the waterfront. These yards do not have any docks, piers, or wharfs. At the Chef Yard, Zepeda worked predominately on Evergreen containers. Zepeda testified that he was never informed where the containers and chassis had been prior to having been brought to the yard for maintenance. Zepeda was a member of the International Longshoremen's Association ("ILA") throughout his employment with NOMC. He was also a member of ILA during his time with NODSI, but switched to non-union employment at some point while so employed.

Kirk Williams, the owner of NODSI, testified that he started the company

---

[1] "[A] chassis is what most lay persons would call the 'trailer' portion of a tractor/trailer rig, while the container is the load-carrying metal box that sits upon it." *Atl. Container Serv., Inc. v. Coleman*, 904 F.2d 611, 612 (11th Cir. 1990).

[2] It is undisputed that Zepeda was an employee covered under the Act while working for NOMC. Pursuant to the "last employer rule" which applies to claims involving noise-induced hearing loss, the employer during the last covered employment in which the claimant was exposed to injurious stimuli is liable for the full amount of the benefits award. *Avondale Indus., Inc. v. Dir., Office of Workers' Comp. Programs*, 977 F.2d 186, 189 (5th Cir. 1992). Accordingly, if it is established that Zepeda was covered under the LHWCA during his subsequent employment with NODSI, NODSI will be liable for the full amount of his benefits although Zepeda was exposed to injurious stimuli during his months of employment with NOMC.

in 1996. NODSI was initiated primarily to serve the container needs of Evergreen, a company specializing in the transportation of oceangoing cargo in a fully containerized atmosphere. NODSI serviced Evergreen exclusively until 2002, when it also contracted with Mitsui O.S.K. for similar services. Williams testified that Evergreen did not request that NODSI be set up in a specific location. Williams further testified that he selected the location for the Chef Yard because of the hard land, and did not consider access to a waterway. The Terminal Yard was acquired through a lease with the Board of Commissioners for the Port of New Orleans. Williams testified that access to a waterway was not a consideration in the selection of the Terminal Yard site.

Zepeda's son, a terminal supervisor for NODSI, testified in his deposition that the containers to be repaired are rarely labeled to identify which customer owns the containers. He stated that he would not know whether the containers came into the Port of New Orleans by ship. He also testified that Zepeda performed most of his work in the Chef Yard, which had more than 1,000 containers going in and out of the yard each year.

Thomas Brooks, a claims adjuster hired by Ports America, the successor of NOMC, testified regarding the composition of the area surrounding both yards. By his account, there are several trucking and industrial yards, a coffee roasting plant, several marine facilities, and terminals near the Chef Yard. Near the Terminal Yard, there are tank storage facilities and a trucking facility with large marine containers.

Dominic Obrigkeit, senior vice-president of the international business division of Evergreen, was deposed. He testified that Evergreen's oceangoing containers would enter and exit the Port of New Orleans on ships owned by Lykes, pursuant to a share-space agreement. Evergreen maintained an office in New Orleans to allow for oversight of the day-to-day transfer of containers through the Port of New Orleans. Damaged containers would be sent to local

contractors near the offload site for repairs.  Pursuant to a master contract with the ILA, local contractors were required to have ILA labor employees at their facilities to make repairs to Evergreen containers.  Obrigkeit was not aware of any division of ship and rail containers at local contractors.

The ALJ determined that NODSI was liable for Zepeda's benefits as his last maritime employer.  The ALJ found that Zepeda, an ILA union employee, worked exclusively on Evergreen containers until 2002.  He further found that Evergreen employed local contractors for repairs of containers used in both rail and marine shipping.  Accordingly, as Zepeda solely repaired Evergreen containers, the ALJ concluded that he repaired marine containers at least some of the time during his employment with NODSI, thus satisfying the maritime status requirement.  Additionally, the ALJ determined that both the Chef Yard and Terminal Yard satisfy the geographical nexus of the situs requirement. The ALJ also determined that the Chef Yard satisfies the functional nexus component of the maritime situs requirement.  Therfore, the ALJ determined that Zepeda's injury occasioned during his employment with NODSI was covered by the LHWCA.

On December 3, 2010, the BRB affirmed the ALJ's decision.  Thereafter, NODSI brought the instant petition for review of the BRB's decision.

## II.

"Our review of Review Board decisions is limited to considering errors of law and ensuring that the Review Board adhered to its statutory standard of review, that is, whether the ALJ's findings of fact are supported by substantial evidence and are consistent with the law." *Sisson v. Davis & Sons, Inc.*, 131 F.3d 555, 557 (5th Cir. 1998). "Substantial evidence is that relevant evidence- more than a scintilla but less than a preponderance- that would cause a reasonable person to accept the fact finding." *Coastal Prod. Servs. Inc. v.*

No. 11-60057

*Hudson*, 555 F.3d 426, 430 (5th Cir. 2009) (internal quotation marks omitted). We review the BRB's legal conclusions de novo. *Id.*

"Although perhaps somewhat quizzical in light of the typical understanding of the difference between conclusions of law and findings of fact, we decided in *Texports Stevedore Co. v. Winchester* that the determination of situs by the ALJ is one of fact." *Id.* (citing 632 F.2d 504, 515 (5th Cir. 1980) (en banc)). "Status determinations are also findings of fact, unless made under an erroneous legal standard." *Id.* at 430-31. "[T]he ALJ's selection of reasonable conflicting factual inferences is conclusive . . . if supported by the evidence and not inconsistent with the law." *Hullinghorst Indus., Inc. v. Carroll*, 650 F.2d 750, 753 (5th Cir. 1981). "This Court may not substitute our judgment for that of the ALJ, nor reweigh or reappraise the evidence, but may only determine whether evidence exists to support the ALJ's findings." *Cooper/T. Smith Stevedoring Co. v. Liuzza*, 293 F.3d 741, 745 (5th Cir. 2002) (internal quotation marks omitted).[3]

## III.

The LHWCA is a federal workers' compensation scheme for the benefit of maritime workers. "Prior to 1972, the Act applied only to injuries occurring on navigable waters. Longshoremen loading or unloading a ship were covered on the ship and the gangplank but not shoreward, even though they were performing the same functions whether on or off the ship." *Chesapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 46 (1989). To obviate this inequitable result, Congress broadened the coverage to embrace maritime activities on land near the water.

---

[3] We note that the dissenting opinion, while concluding that the ALJ's decision should be overturned, ignores the deferential standard of review for factual findings required by our precedents and instead seeks to frame the dispositive issues in this case as legal rather than factual ones.

No. 11-60057

"The Supreme Court has cautioned that we must 'take an *expansive* view of the extended coverage' of the LHWCA." *Sisson*, 131 F.3d at 557 (quoting *Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 268 (1977)) (emphasis added). "The Act should be liberally construed in favor of injured workers, 'in conformance with its purpose, and in a way that avoids harsh and incongruous results.'" *Winchester*, 632 F.2d at 515 (quoting *Voris v. Eikel*, 346 U.S. 328, 333 (1953)). There is a "presumption of coverage." *Id.* at 508.

"For a claimant to be eligible for benefits under the LHWCA (1) his injury must occur on a maritime situs, and (2) his status must be that of a maritime employee. Both requirements must be met for the claimant to receive benefits under the Act." *Hudson*, 555 F.3d at 431.

The situs requirement derives from 33 U.S.C. § 903, which states:

> Except as otherwise provided in this section, compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

33 U.S.C. § 903(a).

The status requirement derives from 33 U.S.C. § 902, which provides that "[t]he term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker . . . ." 33 U.S.C. § 902(3).

In this case, NODSI objects to the ALJ's factual findings that the Chef Yard is a maritime situs and that Zepeda is a maritime employee for purposes of the LHWCA.

6

No. 11-60057

## A. Situs

As Zepeda's injury from his employment with NODSI was not incurred on navigable waters, liability may be imposed on NODSI only if its facility constitutes an "other adjoining area," pursuant to 33 U.S.C. § 903(a). In this circuit, when deciding whether a location satisfies the situs component of LHWCA coverage, courts consider both the geographic proximity to the water's edge and the functional relationship of the location to maritime activity. *Winchester*, 632 F.2d at 514-15 ("So long as the site is close to or in the vicinity of navigable waters, or in a neighboring area, an employee's injury can come within the LHW[C]A. . . . The perimeter of an area is defined by function."*)*. NODSI has conceded that the Chef Yard satisfies the geographic proximity requirement of the situs inquiry; accordingly, its sole challenge to the ALJ's finding that the Chef Yard is a covered situs is that the location lacks the functional relationship to maritime activity required by the LHWCA.

"The statute does not require that the area's exclusive use be for maritime purposes so long as it is customarily used for significant maritime activity." *Id.* at 515. "The situs need not be used . . . even primarily for maritime purposes . . . ." *Hudson*, 555 F.3d at 433.

> [S]imply because a vessel cannot dock for loading and unloading at a particular area does not mean that the area is not a covered situs. . . . [I]f a particular area is *associated with items used as part of the loading process*, the area need not itself be directly involved in loading or unloading a vessel or physically connected to the point of loading or unloading.

*Id.* at 434 (emphasis added). "The character of surrounding properties is but one factor to be considered in determining whether a site is an 'adjoining area' under the LHW[C]A." *Winchester,* 632 F.2d at 513.

"[T]he LHWCA is to be construed liberally in favor of compensation." *Hudson*, 555 F.3d at 437. "A broad interpretation of the maritime situs

requirement reduces the number of workers walking in and out of coverage and promotes uniformity." *Winchester*, 632 F.2d at 516. "If the situs determination is supported by substantial evidence on the record as a whole, it will not be set aside by this court." *Id.* at 515.

In this case, the ALJ relied on several items of evidence in reaching his determination that the Chef Yard is a maritime situs. The ALJ found that, regardless of NODSI's employees' awareness of such, some of the Evergreen containers repaired by NODSI were used for marine transportation and were offloaded at the Port of New Orleans. NODSI initially only serviced Evergreen containers, and was required, pursuant to Evergreen's labor contract, to hire unionized maritime workers, including Zepeda. Accordingly, the ALJ determined that the functional nexus requirement was satisfied because Evergreen's marine containers, which were used for marine transportation or had previously been used in marine transportation, were stored and repaired at the Chef Yard. In addition to the evidence explicitly relied upon by the ALJ as the basis for his decision, our independent review of the record has identified other evidence supportive of the maritime situs determination, notably the testimony of Brooks, a claims adjustor, acknowledging the presence of marine facilities in the area surrounding the Chef yard. Applying the deferential standard of review required by *Winchester*, it is clear that the ALJ's situs determination is supported by substantial evidence in the record as a whole.[4]

---

[4] The dissent asserts that the functional nexus test cannot be satisfied in this case because marine shipping containers, which were stored and repaired at the Chef Yard, are "loaded" and, therefore, categorically are not "items used as part of the loading process." This narrow distinction finds no support in the language of the LHWCA, is contrary to the broad construction of the statute required by our applicable precedents, and ignores our fundamental deferential review of the ALJ's factual determinations. The question before us is not whether we would have reached the same factual conclusion in the first instance; rather, we must determine whether there is more than a scintilla of evidence in the record to support the ALJ's factual finding. For all of the reasons enumerated above, it is clear that there is sufficient evidence establishing that the Chef Yard is "*associated with* items used *as part* of the loading

No. 11-60057

In opposition, NODSI relies in large part on the Ninth Circuit's decision in *Brady-Hamilton Stevedore Co. v. Herron*, 568 F.2d 137 (9th Cir. 1978), which has subsequently been interpreted in that circuit as having set out specific factors to be considered when determining whether an adjoining area bears a sufficient functional relationship to a waterway so as to be rendered a maritime situs. *See Motoviloff v. Dir., Office of Workers' Comp. Programs*, 692 F.2d 87, 89 (9th Cir. 1982) ("Among factors to be considered in determining such relationship are (1) the particular suitability of the site for maritime uses; (2) whether adjoining properties are devoted primarily to uses in maritime commerce; (3) the proximity to the waterway; and (4) whether the adjoining site is as close to the waterway as feasible.").

For a couple of reasons, the analogous cases from the Ninth Circuit do not determine our result here. First, in *Winchester*, an en banc decision, this court rejected the application of a formulaic factor test for resolving situs issues under the LHWCA. *See Winchester*, 632 F.2d at 513-14 ("Just as we disapprove of a test that disposes of the question based totally on the presence or absence of intervening or surrounding maritime facilities, we also reject the idea that Congress intended to substitute for the shoreline another hard line. . . . All circumstances must be examined."). Additionally, though it appears that the Ninth Circuit applies the same deferential standard of review mandated in this circuit by *Winchester*,[5] the posture of *Motiviloff*, the single Ninth Circuit case cited by NODSI holding that an employer's facility is not a maritime situs, is appreciably different from that of the present case in one notable respect: in *Motoviloff*, the ALJ denied the claim for benefits and the BRB affirmed the

_____

process . . . ." *Hudson*, 555 F.3d at 434 (emphasis added). Accordingly, the ALJ's situs determination must be affirmed.

[5] *See Herron*, 568 F.2d at 140 n.2 ("[T]he[] findings [of the ALJ] are controlling if supported by substantial evidence in the record considered as a whole.").

denial; whereas, in the present case, the ALJ held NODSI liable for Zepeda's benefits and the BRB affirmed this decision.

Given this circuit's deferential review of an ALJ's factual situs determination, we conclude that there is substantial evidence in the record to support the ALJ's factual determination that the Chef Yard is a maritime situs under the LHWCA.

## B. Status

The second part of the coverage analysis asks whether the claimant is a maritime employee as defined by the LHWCA.

> Although the Act does not define "maritime employment," the Supreme Court has instructed that occupations in addition to those enumerated in the statute will be covered as maritime employment if the occupation entails activities that are an integral or essential part of the loading, unloading, building, or repairing of a vessel. In addition, the employee's maritime activities must be more than episodic, momentary, or incidental to his non-maritime work.

*Hudson*, 555 F.3d at 439.

In *Schwalb*, the Supreme Court ruled that workers who performed maintenance and repairs on land to a mechanical conveyor-belt system which transported coal to a loading tower from which it is poured into the hold of a ship were maritime employees pursuant to the LHWCA. The Court stated the following:

> [E]mployees who are injured while *maintaining or repairing equipment essential to the loading or unloading process* are covered by the Act. Such employees are engaged in activity that is an integral part of and essential to those overall processes. . . . Someone who *repairs or maintains a piece of loading equipment* is just as vital to and an integral part of the loading process as the operator of the equipment.

*Schwalb*, 493 U.S. at 47 (emphasis added). Likewise, "[t]his court has made it clear that the *maintenance and repair of tools, equipment, and facilities* used in indisputably maritime activities lies within the scope of 'maritime employment'

No. 11-60057

as that term is used in the Act." *Carroll*, 650 F.2d at 755. "We have . . . upheld maritime status for an employee who spent only 2.5-5% of his employment engaged in maritime activities when those activities were part of his regularly assigned duties . . . ." *Hudson*, 555 F.3d at 441.

"That the skills utilized by [the claimant] were 'essentially nonmaritime' in character is immaterial. It is the purpose of the work that is the key; 'nonmaritime' skills applied to a maritime project are maritime for purposes of the 'maritime employment' test of the Act." *Carroll*, 650 F.2d at 756,

Although this court has not previously addressed the scope of maritime employment under the LHWCA in the context of container repair, the Eleventh Circuit addressed this scenario in *Atlantic Container Service, Inc. v. Coleman*, 904 F.2d 611 (11th Cir. 1990), which ruled that an employer was liable under the Act for a claimant's back injury incurred while working on chassis and containers owned by a shipping company. The court reasoned that, as in *Schwalb*, container repair was an integral part of the loading process. *See Coleman*, 904 F.2d at 618 ("[C]ontainers, . . . which [the claimant] worked on periodically, are essential to the loading and unloading process.").[6]

---

[6] We note that the dissent's interpretation of the LHWCA, according to which the repair of shipping containers used in maritime transport is not maritime activity within the purview of the statute, would create a circuit split. *See Alfaro v. Commissioner*, 349 F.3d 225, 229 (5th Cir. 2003) ("We are always chary to create a circuit split."). According to our precedents, circuit splits should be avoided unless persuasive reasons exists for creating them. *See United States v. Adam*, 296 F.3d 327, 332 (5th Cir. 2002); *Carranza-De Salinas v. Gonzales*, 477 F.3d 200, 208 (5th Cir. 2000). In our view, the dissent's attempt to distinguish a carpenter's construction of scaffolding, to be used by others, beneath a pier, which we concluded was maritime employment in *Carroll*, from the employment at issue in the present case is unpersuasive. It is clear that the repair of marine shipping containers constitutes the "repair of tools, equipment, and facilities *used in* indisputably maritime activities . . . ." *Carroll*, 650 F.2d at 755 (emphasis added). This conclusion is reinforced by the fact that Evergreen, an international shipping company, once employed NODSI as its sole contractor for the repair of oceangoing containers which had entered the Port of New Orleans.

11

No. 11-60057

In the present case, the ALJ determined that Zepeda engaged in maritime employment because, as an ILA employee, he worked on Evergreen marine shipping containers. Testimony revealed that the containers came into the Port of New Orleans aboard ships, and were sent to local contractors for repair. Zepeda worked a portion of his employment with NODSI solely on Evergreen containers and, therefore, repaired marine shipping containers at least some of the time. The ALJ considered marine container repair an essential function of the loading and unloading process.

The ALJ's reasoning in this case is consistent with our case law. Accordingly, the ALJ's factual determination with respect to maritime status is entitled to deferential review for substantial evidence in the record. We conclude that there is sufficient evidence in the record to support the ALJ's factual finding that Zepeda, while employed by NODSI, was a maritime employee for purposes of the LHWCA.

## IV.

For the foregoing reasons, we determine that there is substantial evidence in the record to support the ALJ's factual determinations and the BRB's decision to affirm. Accordingly, the petition for review is DENIED.

No. 11-60057

EDITH BROWN CLEMENT, Circuit Judge, dissenting.

The majority's analysis expansively applies precedent that had already expanded the controlling statute to its limits. The result is an outcome that is not only entirely divorced from the plain language of the statute, but that also lacks any connection to the realities of maritime industry and creates needless uncertainty for employers with operations anywhere in the vicinity of a waterway.

The following facts provide the context for understanding the majority's errors: Within the scope of his employment with NODSI, Zepeda never loaded or unloaded a vessel, never assisted anyone else who was loading or unloading a vessel, never so much as witnessed a vessel being loaded or unloaded; he never set foot on a ship, dock, pier, or wharf; he never worked at a job site that was used to load or unload vessels; and the Chef Yard, Zepeda's primary workplace while employed by NODSI and the only work site at issue, is not connected to or even surrounded by areas used to load or unload vessels, and, critically, is not used to repair or maintain equipment that is used to load or unload ships. Despite these facts, the majority still concludes that NODSI can be held liable under a statute that should apply to him only if Zepeda played an "integral or essential part of loading or unloading a vessel," *Chesapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 45 (1989), and was injured at a maritime situs, 33 U.S.C. § 903(a). Because this conclusion is contrary to law and common sense, I respectfully dissent.

## I. Situs

"For a claimant to be eligible for benefits under the LHWCA (1) his injury must occur on a maritime situs, and (2) his status must be that of a maritime employee." *Coastal Prod. Servs. Inc. v. Hudson*, 555 F.3d 426, 431 (5th Cir. 2009). Because the Zepeda's injury clearly did not occur "upon the navigable waters of the United States" or on an "adjoining pier, wharf, dry dock, terminal,

No. 11-60057

building way, [or] marine railway," he is eligible for benefits only if the Chef Yard constitutes an "other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a). The respondents concede the Chef Yard has no connection to repairing, dismantling, or building vessels, so the decisive question is whether the Chef Yard is an "adjoining area" that is "customarily used . . . in loading [or] unloading." Even under the framework of our already-expansive precedents, the answer to this question is, quite clearly, no.

Our cases break this "other adjoining area" question into two inquiries: (1) whether the situs in question is sufficiently close to the waterfront (geographic nexus) (2) and whether it has a functional nexus to maritime activity. *See Hudson*, 555 F.3d at 432. The ALJ defined the relevant "area" as the Chef Yard itself. NODSI concedes that, under our caselaw, the Chef Yard satisfies the geographic nexus prong. The relevant inquiry is therefore whether the work done at the Chef Yard, storing and repairing cargo containers, is customarily part of the loading or unloading process.

"Loading and unloading" is the work customarily done by longshoremen or stevedores. Precedent requires us to construe the "loading and unloading" broadly to include not only the physical movement of cargo on and off ships but also those additional related functions that contribute to the overall loading or unloading process by making the physical loading and unloading possible. Even construing the loading process exceptionally broadly, however, it still does not encompass container repair, a function that, both customarily and on these specific facts, is operationally separate and distinct. "Loading and unloading" cannot reasonably be interpreted to encompass every step in the overall supply chain surrounding marine shipping. Those conducting loading operations are not customarily involved with the prior step of containering or packaging the ocean-going cargo that they load. In most instances, including this one, marine cargo

14

is packaged well before it is delivered to be loaded. From the point of view of stevedores, then, the container (whatever may be inside it) is simply part of the cargo: it is the thing to be loaded. Moreover, container repair is an additional step removed from the loading process because it happens either before such containers are filled with cargo or after they are empty. It is undisputed that the containers Zepeda repaired arrived at and departed from the Chef Yard completely empty. His work was therefore twice removed from the ship-loading process.

Because there are no facts indicating that the container repair work done at the Chef Yard is part of any loading or unloading process, the yard lacks a functional nexus to maritime activity. To return to the language of the controlling statute, the Chef Yard is emphatically not "customarily used . . . in loading [or] unloading."

Our cases are not to the contrary. In *Texports Stevedore Co. v. Winchester*, on which the respondents heavily rely, the situs in question was a "gear room" used by a stevedore company to store, repair, and maintain "the equipment used by stevedores to perform the loading operation." 632 F.2d 504, 506 & n.1 (5th Cir. 1980) (en banc). In upholding the ALJ's situs determination, the en banc court credited the ALJ's finding that the functional nexus requirement was satisfied because "the gear room operations were part of the on-going overall loading process." *Id.* at 515. The gear room was therefore critically different from the Chef Yard.

Unlike the Chef Yard, the gear room in *Winchester* was used by a stevedore company as an indispensable part of its loading operations, and was therefore part of the same "overall loading process." Operating a gear room or similar facility is essential to the work of stevedores because they must continually store, maintain, and repair their own equipment in order to provide

No. 11-60057

loading and unloading services.[1] The Chef Yard was not integrated into any loading process because the work done there—container repair—is not part of the work that must be done by those who are charged with loading vessels.

For the same reason, the language from *Hudson* on which the majority relies is inapplicable. In *Hudson*, we stated that "if a particular area is associated with *items used as part of the loading process*, the area need not itself be directly involved in loading or unloading a vessel or physically connected to the point of loading or unloading." *Hudson*, 555 F.3d at 434 (emphasis added). As broad as this language is, it still does not apply to the Chef Yard because shipping containers are not "items used as part of the loading process." Marine containers are not used to load; they are *loaded*. This distinction will seem insignificant only if one fails to appreciate the division of labor customarily observed in marine shipping. From the point of view of those actually involved in the industry, the difference between "items used as part of the loading process" and "items that are loaded" is both clear and highly important—for stevedores, it is the difference between "my tools" and "my customer's property."[2]

The container repair work performed by Zepeda and others at the Chef Yard is not part of a loading or unloading process. Of course, one could artificially define the loading or unloading process as broadly as suits his purposes. But the statute, quite understandably, ties maritime functions to custom, and the work performed at the Chef Yard is not integral to the customarily-defined process of loading or unloading ships—it falls entirely

---

[1] A stevedore company, of course, could hire a subcontractor to operate a gear room, but whether conducted "in-house" or by third-parties, such operations are the responsibility of stevedores. A marine shipper does not repair the equipment stevedores use to load the shipper's cargo.

[2] The majority's analysis essentially equates an area "associated with items *used as part* of the loading process" with an area "associated with items *associated with* the loading process," which greatly extends the reach of this already expansive language.

16

outside the parameters of what a longshoring company must do or provide in order to load or unload a ship successfully. Accordingly, the Chef Yard is not a maritime situs under the LHWCA.

That the Chef Yard was not part of any "overall loading process" is highlighted by the fact that NODSI's only customer was not a stevedore company but Evergreen, a shipping company that conducts no loading or unloading operations. This means that whoever was hired to load Evergreen's containers onto its ships had no connection to or responsibility for repairing containers. Of course, a single employer could conduct both shipping and loading operations, but the separate actors involved illustrate what should have been clear anyway: container repair is functionally separate from the loading process. The ALJ therefore erred in concluding that the functional nexus requirement was satisfied because Evergreen's containers were stored and repaired at the Chef Yard.

The majority relies on the testimony of a claims adjustor "acknowledging the presence of marine facilities in the area surrounding the Chef yard." Majority Op. at 8. But this is misleading. The record shows that the Chef Yard was surrounded primarily by non-maritime businesses including a car wash, automotive shops, a warehouse, and manufacturing plants. Even more problematic is that the "presence of marine facilities" would do nothing to demonstrate that the Chef Yard, or anything near it, was an area customarily used in *loading*, which is what the evidence must show in order to support the award of benefits. Implicit in the majority's reasoning is a decision to define the relevant "area" as something larger than merely the Chef Yard, but this means that the adjacent buildings form part of the same "area" for purposes of the situs determination. The consequence of this analysis is that the neighboring car wash

17

No. 11-60057

would also constitute a maritime situs. The ALJ's situs determination was not supported by substantial evidence.[3]

The majority cites the principle that the LHWCA should be "liberally construed," but fails to appreciate that our construction of the statute must still "conform[] with its purpose." *Winchester*, 632 F.2d at 515 (quoting *Voris v. Eikel*, 346 U.S. 328, 333 (1953)). One purpose of the 1972 amendments to the LHWCA emphasized in our past decisions was to "reduc[e] the number of employees walking in and out of coverage." *Id.* at 511.

> Prior to 1972, the [LHWCA] applied only to injuries occurring on navigable waters. Longshoremen loading or unloading a ship were covered on the ship and the gangplank but not shoreward, even though they were performing the same functions whether on or off the ship. Congress acted to obviate this anomaly: § 903(a) extended coverage to the area adjacent to the ship that is normally used for loading and unloading, but restricted the covered activity within that area to maritime employment.

*Schwalb*, 493 U.S. at 46. But unlike the gear man in *Winchester* and the janitors and machinist in *Schwalb*, neither Zepeda nor his coworkers at the Chef Yard performed any portion of their work on the docks or aboard ships, and treating the Chef Yard as a maritime situs is therefore unrelated to "reducing the number of employees walking in and out of coverage." The majority has not pointed to another purpose of the act that its exceptionally expansive

---

[3] The majority, understandably, relies heavily on the deferential standard of review, but its approach exemplifies a troubling pattern that has developed in our case law. Rather than analyzing whether there is substantial evidence that the Chef Yard is "used in loading or unloading," the majority merely concludes that the AJL's situs determination is only a minor expansion of what has previously been accepted as a maritime situs, and therefore approves the expansion. The problem with this approach is that, as the majority essentially concedes, it results in an ever-shifting baseline for evaluating the reasonableness of the BRB's decisions. So long as each case is only incrementally more expansive than the last, it is bound to be upheld. Accordingly, the LHWCA is gradually swallowing every employer in the vicinity of a port.

No. 11-60057

interpretation of the situs requirement promotes, leaving the ever-growing reach of the LHWCA unchecked by any discernible limiting principle.

## II. Status

For similar reasons, Zepeda is not a maritime employee under the LHWCA.[4] "[A]side from the [occupations specified in the LHWCA], land-based activity . . . will be deemed maritime only if it is an integral or essential part of loading or unloading a vessel." *Id.* at 45.[5] As explained, the container repair work performed by Zepeda for NODSI was not integral to shiploading.

Container repair cannot possibly be "integral" to loading because the two processes happen separately and neither is dependent on the other. Customarily, container repair and ship loading are not conducted, organized, coordinated, overseen, or commissioned by the same person or entity. *See Winchester*, 632 F.2d at 511 ("The inquiry is whether the claimant is engaged in or spends some of his time in activities traditionally performed by longshoremen."). Unlike the equipment repair and maintenance work the Supreme Court considered maritime in *Schwalb*, Zepeda's work was never necessary to keep any loading process going. *Schwalb*, 493 U.S. at 48 ("The *determinative consideration* is that the *ship loading process could not continue* unless the retarder that [respondent] worked on was operating properly. It is notable that the *loading actually was stopped* while [respondent] made the repairs . . . ." (emphasis added)).

The respondents rely on our decision in *Hullinghorst Indus., Inc. v. Carroll*, 650 F.2d 750 (5th Cir. 1981), in which we upheld a BRB determination

---

[4] Although the "situs" and "status" inquiries are distinct, the functional nexus component of the situs test will naturally converge with the status test where a claimant's injury is sustained during the ordinary course of his employment at his regular workplace.

[5] The majority repeats that Zepeda was, during some of his employment by NODSI, a member of a longshoremen union, but this is of no import because this court has already held, en banc, that "[u]nion jurisdiction and the employer's whim are not definitive on whether activities are 'maritime employment.'" *Winchester*, 632 F.2d at 511.

19

that Carroll, a carpenter injured while building scaffolding beneath a pier, was a maritime employee for purposes of the LHWCA. Carroll was an employee of a scaffolding contractor hired by the owner of the pier, whose business included the loading and unloading of ships. The loading company planned to use the scaffolding built by Carroll to "repair . . . a turntable (affixed to the pier) used by [its] longshoremen in the loading and unloading of ships," but Carroll did not repair the turntable itself or otherwise participate in the physical loading of cargo. *Id.* at 756. Although Carroll had no direct involvement in loading or unloading, the critical fact was that his scaffolding work "directly furthered . . . the loading and unloading of ships" by enabling the owner of the pier to perform its core longshoring operations. *Id.*

Zepeda, on the contrary, was not similarly a part of loading or unloading operations because his work was not something that a loading company would have to arrange or commission in order to load ships. The relevant question is whether the work at issue is within the purview of what a loading company would have to accomplish in order to successfully carry out its shiploading work. Because a loading company must provide for (whether with its own employees or independent contractors)[6] the repair of its piers and loading equipment, but is not responsible for packaging its customers' cargo, *Carroll* is readily distinguishable. Zepeda was not "an integral part" of shiploading or any other maritime project and therefore is not a maritime employee within the meaning of the LHWCA.

---

[6] *Carroll* made it clear that it does not matter whether the claimant's employer also has employees directly involved in loading and unloading operations, but that decision did nothing to change the requirement that the claimant must perform work that is "an integral or essential part of loading or unloading a vessel."

### III. Conclusion

The majority's reasoning sweeps so broadly that it threatens to swallow every employer with even a tangential relation to the maritime industry. If a worker whose sole responsibility is to repair containers is covered by the LHWCA, why not a factory worker who manufactures those same containers? And if container manufacturing has a sufficient connection to loading, so also will the manufacture of countless other products that have some potential use in maritime activities. For example, a machinist working on an assembly line making cranes, some of which will eventually be used in shiploading by the manufacturer's stevedore customers, has just as close a connection to loading and unloading operations as did Zepeda during his employment with NODSI, assuming only that the crane factory is located in an industrial district in the general vicinity of a port or harbor. But it does not end there. On the majority's reasoning, it is not at all clear why a cobbler's apprentice who repairs shoes for stevedores would not be covered by the LHWCA. The repaired shoes are, unlike repaired containers, "items used as part of the loading process," and the cobbler's shop is therefore a better candidate for maritime situs than is the Chef Yard.

Many non-maritime employers, including NODSI, prefer to locate their businesses in industrial districts close to waterways for reasons that have little to do with their proximity to the water. For example, property is relatively affordable and industrial uses are often permitted in such locations. But such businesses will now be pushed to move their operations inland because the only remaining way to ensure that they are not unintentionally subjecting themselves to LHWCA liability is to move far enough away from the waterfront to defeat the "geographic nexus" requirement. Unfortunately, even this strategy is fraught with uncertainty because our previous cases have implicitly eliminated any meaningful, independent proximity-based requirement from the statute's situs provisions. *See Winchester*, 632 F.2d at 520 (Tjoflat, J., dissenting) ("To approach

21

the situs question as one determined solely by function is effectively to read the situs requirement out of the [LHWCA] . . . ."). Just how far inland does one need to go?

Employers should be able to ascertain their potential liability under the LHWCA, and the majority's opinion will make that more difficult than ever. In this vein, it is important to note that NODSI consulted two separate insurance brokers, who both advised that the company did not need LHWCA insurance. Industry expectations cannot be controlling of our decisions, but we have previously stated that "Congress intended that liability should be imposed only where the employer had real or constructive notice of the likelihood of coverage." *Carroll*, 650 F.2d at 757.

I respectfully dissent.